LARRY IVAN COX *v.* REBECCA LOU COX.

[No. 1-872A56. Filed February 28, 1973. Rehearing denied March 20, 1973. Transfer denied June 8, 1973.]

*Terry Noffsinger, Bates, Ewers & Noffsinger,* of counsel, of Evansville, for appellant.

*Allyn, Knowles and Givens,* of Mt. Vernon, for appellee.

LYBROOK, J.—Plaintiff-appellee, Rebecca Lou Cox Will Reynolds, instituted modification proceedings, seeking to regain custody of her two children by a previous marriage. Defendant-appellant, Larry Ivan Cox, brings this appeal from the trial court's order granting increased visitation privileges to appellee.

On December 17, 1964, an absolute divorce was granted appellee and she was awarded custody of the children. Appellant was granted temporary custody for two weekends per month and one month during the summer, and the privilege of further visitation at all reasonable times.

On January 25, 1968, the court modified the decree and gave custody of the children to appellant. Appellee endorsed her "O.K." on the petition to modify and did not appear at the hearing. She was awarded reasonable visitation.

The current controversy arose on December 22, 1971, when appellee filed a petition to modify the decree, asking that she again be awarded custody of the children. The petition alleged that since the previous modification:

". . . there has been a substantial change of circumstances in the following particulars, to-wit:

"(a) That at the time of said modification, plaintiff was suffering with a serious health problem, which has since been corrected.

"(b)  That plaintiff's marriage to a subsequent husband was being terminated by divorce and plaintiff expected to be unable to furnish housing or care for said children. "(c)  That plaintiff is now remarried and has an adequate home, in which to care for said children, and plaintiff is now physically able to care for said children."

Evidence at the hearing showed that during her marriage to Cox and her subsequent marriage to Edward Will in 1965, appellee had two major operations on her leg.  Her leg was subsequently amputated and replaced with an artificial limb. Appellee testified that she relinquished custody of the children in 1968 because of her poor health and the fact that her marriage was breaking up.  She further testified:

"He [Will] said if I got custody of the kids he would kill me, or of Christy, and he was afraid if I got Larry and Sonya then I would get Christy too, so he told me he would kill me before I got home.  So he made me sign these papers."

After the 1968 divorce from Will, appellee lived in Louisiana with some girl friends for four months, in Las Vegas with one George Fuquay for four months, in Louisiana again for a month and in Washington D.C. with George Fuquay for two months. She finally returned to Mt. Vernon in 1970 and has lived there since then, excepting two months when she lived in Iowa with her sister, while giving birth to a child fathered by George Fuquay.  Appellee also testified that since giving up custody of the children in 1968, she hadn't been employed.

According to appellee, it has been very difficult for her to see the children.  She testified that:

"Well, if I'd call and say I was coming they would say they weren't going to be there.  So if I would just drive over there and they were home, they have even hidden and acted like they weren't at home, but I've seen the kids peeping out the window.  Then several times they would just drive off while I was there."

She also testified that:

". . . I'd drive over there, and I even had other people with me that know this is true, and they would get in the car and drive off and leave me sitting in the driveway, and if they did let me see them, which was only a few times, the kids would have to stand in the driveway and talk to me. But she would usually tell them to go do something, you know, so that would leave me sitting in the car like something stupid. And then everytime, my little boy won't say anything but 'I guess' and everytime Sonya would say something he'll say 'Daddy's gonna whip you.' And then when I leave they cry to go home with me and he says I talk to them about coming home with me, but Craig has been with me everytime and I never have."

The trial court did not grant custody to appellee; he merely enlarged the visitation. Instead of "reasonable" visitation the court specified "from 5:00 P.M. on Friday to 8:00 P.M. on Sunday on every other weekend," the first six weeks of the summer vacation and five days during the Christmas holidays.

Cox contends that this enlargement of visitation should not have been made since there was no showing that a change was necessary for the welfare of the children.

The rule is well settled in Indiana that a modification in custody or visitation privileges must be based upon a substantial change in circumstances and the change must be necessary for the welfare of the children. *Mikels* v. *Mikels* (1967), 248 Ind. 585, 228 N.E.2d 20; *Perdue* v. *Perdue* (1970), 254 Ind. 77, 257 N.E.2d 827; etc.

This seemingly strict rule is tempered by the fact that this court will not reverse a trial court ruling unless a clear abuse of discretion is manifested. *Scott* v. *Kell* (1956), 127 Ind. App. 472, 134 N.E.2d 828; *Perdue, supra;* *Renard* v. *Renard* (1956), 126 Ind. App. 245, 132 N.E.2d 278; *Mikels, supra,* and *Brickley* v. *Brickley* (1965), 247 Ind. 201, 210 N.E.2d 850.

As the court said in *Renard, supra:*

"The question presented is one involving sound judicial discretion rather than a hard and fast rule of law. [Citations omitted.] In matters of this nature, the law is well settled that we should not disturb the judgment of the trial court unless the record discloses a clear and manifest abuse of discretion. We are guided by the same rule of law in the decision of this matter as if the petitioner was having an outright modification of custody of children.

"To determine this question requires a review of the evidence most favorable to the appellee."

Further, this court must defer to the judgment of the trial court in matters of credibility and evaluation of the parties and witnesses. As the Supreme Court said in *Mikels, supra:*

". . . in determining the import and the decisive character of the evidence, the trial judge, before whom the parties and the witnesses appeared, is clothed with the obligation and responsibility of evaluation. If there is any evidence, or legitimate inferences therefrom, to support the finding and judgment of the trial court, this Court may not intercede or interfere and exercise or use its judgment as a substitute for that of the trial court."

Our Supreme Court also quoted with approval from *Gilchrist* v. *Gilchrist* (1947), 225 Ind. 367, 75 N.E.2d 417.

"The disposition of children presents a delicate and perplexing task which has taxed the wisdom of judges since the day of Solomon. The trial court is better able to arrive at a sound and safe conclusion than can a court of review which has only the cold printed or typed record before it. It is true that the facts in this case are not in great dispute, but even where evidentiary facts are admitted different inferences and conclusions may be drawn therefrom, and conclusions and judgments may hang upon intangibles and impressions not cognizable to a court of review. The trial court in this case saw the mother and the stepmother and was in better position to weigh the evidence and the inferences therefrom and determine the best interest of the child, and having done so, it is not for us to substitute our judgment for the judgment of the trial court's unless it appears from uncontradicted and undisputed evidence and the only inferences therefrom that the trial court violated its discretion and reached an untenable position. To reverse

this case would require us to hold that the trial judge violated sound judicial discretion in reaching his conclusion. This we are unwilling to do."

In the case at bar, the trial judge must have determined that it was conducive to the welfare of the children for them to see and learn to know their natural mother. Otherwise he would not have granted the visitation.

In view of the evidence presented in this case, the trial judge could well have concluded that the "reasonable" visitation provision was not working in the best interests of the children. By fixing specific times, the court wisely sought to eliminate this point of controversy, thus insuring the ultimate benefit to be derived from the children spending some time with each parent.

As Justice Givan observed in *Partridge* v. *Partridge* (1971), 257 Ind. 81, 272 N.E.2d 448, it is obvious that visitation should be enjoyed by the parent without custody and

". . . he should be afforded such visitation within all reasonable application of the law so long as this can be accomplished in keeping with the best interests and the welfare of the child."

There is nothing novel about the visitation order of which appellant complains. In fact, its terms are quite similar to those of the first visitation order, which was granted to Cox himself when appellee was given custody of the children.

We conclude that the trial judge did not abuse his discretion.

Judgment affirmed.

Robertson, P.J. and Lowdermilk, J., concur.